**UNITED STATES of America**

v.

**David Rayn QUEEN, Dale Woodrow Black.**

**Nos. C–CR–89–110–01, C–CR–89–110–02.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 15, 1990.

See also, —— F.Supp. ——.

H. Thomas Church, Asst. U.S. Atty., for U.S.

James F. Wyatt, III, Charlotte, N.C., for David Rayn Queen.

James Gray, Gastonia, N.C., and Michael S. Scofield, Charlotte, N.C., for Dale Woodrow Black.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Memorandum and Recommendation (here-

inafter "M & R") filed by United States Magistrate Paul B. Taylor on February 2, 1990.

## I. INTRODUCTION

The M & R is in response to Motions to Suppress filed by Defendants on October 13, 1989. Defendant Queen filed an amendment to the Motion to Suppress on January 8, 1990. The Government responded to the Motions to Suppress on October 27, 1989. On January 11 and 16, 1990, the Magistrate conducted hearings on this matter. Defendant Black filed a timely objection to the M & R on February 12, 1990, and Defendant Queen timely filed his objection to the M & R on February 15, 1990. On February 23, 1990, the Government responded to Defendants' objections to the M & R.

Title 28, United States Code, Section 636(b) permits the Court to designate the Magistrate to hear and determine any pretrial criminal matters except motions to dismiss the indictment or to suppress evidence. When the matter involves motions to dismiss or suppress, the Court may designate the magistrate to conduct evidentiary hearings, and to submit to the Court proposed findings of fact and recommendations of disposition. Within ten days after being served with a copy of the M & R, any party may file written objections to the M & R. The Court must make a de novo determination of those portions of the M & R to which objection is made. Thereafter, the Court may accept, reject or modify the M & R, and the Court may also receive further evidence or recommit the matter to the magistrate with instructions.

In making its de novo review, the Court has carefully reviewed the entire record in this case. In particular, the Court has read the Motions to Suppress along with Defendant Queen's amendment to the Motion, the Government's response to the Motions, the M & R, the objections to the M & R, and the Government's answer to the objections. The Court has also carefully examined the lengthy transcript from the January 11th and 16th hearings. Finally, the Court has studied the applicable law as cited by the parties and the Magistrate. The Court's conclusion of the de novo review follows.

## II. FACTUAL BACKGROUND

Although the Magistrate has done an excellent job in the M & R of setting forth the facts of this case, the Court will summarize the relevant facts for the sake of clarity. The Court does not believe the most important facts are in dispute.

On May 20, 1989 at 12:15 p.m., Sgt. R.T. Lytton of the Gaston County Police Department, received a telephone call from Myra Summey. Summey informed Lytton that Defendant Queen had 3500 pounds of marijuana in the attic of his home as well as "stacks and stacks of money." She gave the address of Defendant Queen's residence as 1816 E. Garrison Avenue. Summey then provided a detailed description of the way the marijuana was packaged. Summey also told Lytton that the reason she was reporting Queen was that she did not want her child around drug dealing, and that she was mad at Queen because she had found him with another woman. She further stated that Queen had recently beaten her.

After receiving the statement, Lytton requested that Summey come to the police station. Five minutes later, Summey arrived at the station and identified herself as Summey. Lytton recognized her voice. Summey brought with her a ledger that she claimed contained records of Queen's drug activities. At the police station, Summey repeated her accusations but provided more detail of the operation and a more detailed description of Queen's house. She also stated that Defendant Black was Queen's partner and that Queen kept the marijuana at his house while Black kept the money and drug records at his house. Summey further stated that she had seen the marijuana in Queen's attic within the past 72 hours, and informed Lytton that he was planning to move it in the immediate future. Lytton also observed several bruises on Summey's body which she claimed Queen caused by throwing her out

of the attic when she was looking at the marijuana.

Thereafter, Lytton drove by the residence located at 1816 E. Garrison Street. The house was located where Summey claimed and matched the description she had given to Lytton. In addition, the boat and blue Nova which Summey had described were in the driveway.

Shortly after 2:30 p.m., Det. Daniel Hawley and Sgt. Edwards of the Gaston County Police Department arrived at the police station. Lytton then introduced Summey to the two officers who took over the investigation.

Summey repeated her allegations consistently with the report she had twice given to Lytton. She also told the officers that she used to live with Queen in Maiden, North Carolina and moved in again with him in March 1989 after both moved to Gastonia. Summey stated that she had numerous conversations with Queen and Black about their drug dealing. Summey further related an incident in which Queen got angry at her 9–year–old son after he witnessed Queen and Black cutting marijuana in the kitchen of Queen's home. Summey also told the officers that she and Queen were experiencing problems in their relationship because of his drug dealing, and that she had moved out of his house the week prior to May 20, 1989. On May 18, 1989, Summey returned to the house to discuss the relationship with Queen. It was on that day she observed 15 to 18 bales of marijuana and other drug paraphernalia in Queen's attic. Summey stated she knew the bales contained marijuana because she recognized it by smell and sight.

After the interview, Hawley prepared a search warrant application for Queen's house. The affidavit recounted the reports by Summey to Lytton and then to Hawley and Edwards. Hawley also stated that he had checked the information and found it to be true and accurate. Hawley also included information obtained from other Gastonia officers that an on-going investigation of Queen's drug activities was being conducted prior to Summey coming forward with her information. Based on the affida-

vit, a state magistrate issued a search warrant for Queen's house.

The subsequent search confirmed the accuracy of Summey's information. In the attic, officers found 46 bales of marijuana and 14 one-pound bags packaged in the manner described by Summey. The officers also discovered various scales, baggies, a shotgun and $840.00 in cash. The marijuana weighed 1,420 pounds. The items were seized and Queen was arrested. Television news crews recorded the incident and ran a story about the search on television that night.

At about 9:00 p.m., Hawley began preparing a search warrant application for Black's residence. Summey was present and revealed that Black kept all the drug money and records at his house. She also told Hawley that Queen and Black had flown to Texas within the past several months to purchase marijuana. During the search of Queen's home, airline tickets to Texas were found in the names of Black and Queen. Summey described Black's house and its location on Can Do Court, and further stated that she thought the address was 4721 Can Do Court. Sgt. Ivey then drove to Can Do Court and found the house described by Summey. Shortly after Ivey arrived at the house, Black's wife returned. Because Ivey feared drug records might be destroyed, he informed Black's wife that if she chose to enter the house before the warrant was executed that he would have to enter as well. After Mrs. Black entered the house, Ivey assumed control of the house, but did not conduct a search at that time.

The magistrate issued the search warrant at 11:58 p.m. based on the above-stated information contained in Hawley's affidavit. In addition, Hawley recounted the successful search of Queen's home and the links of Queen to Black including the airline tickets and an auto dealer partnership owned by both men. At 12:30 a.m. on May 21, 1989, officers searched Black's house. Various records were found as well as approximately $200,000.00 in cash. In addition, the officers discovered a .357 magnum handgun, cigarette rolling machines, bank

records, and over three pounds of marijuana.

A search warrant was later issued for Black's safety deposit box at Branch Banking and Trust based on information provided by Summey. That search revealed $40,-000.00 in cash and a certificate of deposit in the amount of $159,000.00. The cash was seized but the certificate of deposit was returned to Black.

Defendants emphasize several facts. First, none of the officers knew Summey before the incidents, and hence, her reliability as an informant had not been previously tested. Second, Summey did not swear to an affidavit nor was she apprised of the penalties for making a false police report. Finally, the relationship between Summey and Queen was not verified by any independent means such as interviewing Summey's son; having Summey produce a key to the house or a picture of Queen and Summey together or a document showing she lived with Queen; or by having Summey call the residence at 1816 Garrison Boulevard and speak with Queen while the officers listened.

### III. THE MAGISTRATE'S RECOMMENDATIONS

The M & R recommends that the Motions to Suppress be denied. The Magistrate concluded that the search warrants for Black's and Queen's homes were supported by probable cause. Alternatively, the Magistrate found that even if probable cause was lacking that the good faith exception was applicable and legitimized these searches.

As to Black's safety deposit box, the Magistrate did not decide whether the warrant was issued on a showing of probable cause. Instead, the Magistrate recommended that the Court find that the evidence seized be admitted under the good faith exception.

The Motions to Suppress also challenged the constitutionality of searches conducted by the police of American Auto Sales (Queen and Black's place of business) and a 1978 Chevrolet Z–28 Camaro located on the premises of American Auto Sales. At the January 11th hearing, the Government stipulated that it would not seek to introduce any evidence at trial seized during these searches. Thus, the Magistrate recommended the Motions to Suppress evidence seized during these searches be dismissed as moot. Because neither parties' objections challenge this recommendation, the Court will affirm the recommendation without further comment. Thus, the Court's discussion will focus on the constitutionality of searches conducted at Queen's house, Black's house, and Black's safety deposit box.

### IV. DEFENDANTS' OBJECTIONS

#### A. Defendant Queen.

Defendant Queen has stated two arguments to support his contention that the M & R is legally incorrect. Those arguments are:

(1) The tip provided by Summey to the relevant law enforcement officials did not establish probable cause to be believe [sic] that marijuana was located at 1816 Garrison Boulevard; and

(2) The good faith exception does not apply to this case because the search warrant affidavit contain [sic] statements made in reckless disregard of the truth.

#### B. Defendant Black.

Defendant Black's objection does not provide the Court with much guidance. The objection is nothing more than a list of page numbers from the M & R and verbatim portions of sentences found therein. While such an approach to filing an objection may be technically permissible under 28 U.S.C. § 636, the Court does not know on what basis Defendant Black is objecting to the particular portions of the M & R or why Defendant Black believes the M & R is factually or legally inaccurate. Thus, the Court is left in the difficult position of attempting to conjure to what Defendant Black specifically objects.

Nonetheless, the Court has examined each objection. Defendant Black's objection to the findings of facts must be reject-

ed by the Court because Defendants chose not to put on any evidence at the hearings. Thus, the Court can only examine the testimony of the Government's witnesses. The Court agrees with the Magistrate's findings that the officers' testimony was "internally consistent and wholly credible." *See* M & R at 2.

■ Defendant Black's conclusion of law objections numbers (1) and (2) address the Magistrate's conclusion that the so-called "silver platter doctrine" is inapplicable to a case where officers obtain evidence in violation of a defendant's rights under *state* statutory or constitutional law for use in *federal* court. The Magistrate cited extensive case law showing that "every circuit court which has addressed the issue has held that evidence obtained in violation of state law, including state constitutional rights, is nonetheless admissible in a federal prosecution if properly obtained under federal law." *See* M & R at 31. Thus, even if Defendant's proposition is true that the North Carolina Supreme Court has rejected a good faith exception under *state law,* that fact is meaningless for purposes of a *federal prosecution.* Defendant has failed to cite a single case to the contrary, and the Court's review of the case law cited by the Magistrate demonstrates that the M & R is legally sound on that basis. Thus, the Court rejects Defendant Black's objection to the M & R conclusion of law numbers (1) and (2).

Defendant Black's conclusions of law objections numbers (3) through (8) address the Magistrate's conclusion that ample probable cause existed for the search warrant of Defendant Black's house to be issued. These objections will be addressed below in the "Probable Cause" section of the discussion.

Defendant Black's conclusion of law objections numbers (9) through (12) address the Magistrate's conclusion that the good faith exception was applicable to the search of Black's house. These arguments will be addressed below under the "Good Faith Exception" section of the discussion.

■ Defendant Black's conclusion of law objection number (13) addresses the sup-

posed illegal entry by Sgt. Ivey into Black's house. The Court agrees with the Magistrate that *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) does not require suppression of evidence seized from a residence where there may have been an illegal initial entry, but a search warrant was obtained and no search was conducted prior to the warrant arriving at the residence. *See* M & R at 40. In this case, the Court believes Ivey was justified in taking control of the residence. Ivey gave Black's wife the option of entering the house. Had she not chosen to enter the house, Ivey would not have feared the possible destruction of drug documents and hence, a need to control the premises would not have existed.

Defendant Black's conclusion of law objection numbers (14) through (18) address the Magistrate's conclusion that the good faith exception justified the seizure of evidence found in Defendant's safety deposit box. The Court will address these objections below in the "Good Faith Exception" section of the discussion.

Defendant Black's conclusion of law objections numbers (19) and (20) address whether the scope of the search warrant of Black's safety deposit box was excessive. The Court concurs with the Magistrate's reliance on *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The Court agrees that "the language contained in the present warrant is no more general than that contained in *Andresen v. Maryland." See* M & R at 44.

To summarize, the Court finds no merit in Defendant Black's Findings of Fact objections. Likewise, the Court believes Defendant Black's conclusion of law objections numbers (1), (2), (13), (19), and (20) are invalid on their face. Thus, the Court adopts the Magistrate's conclusions of law as to these objections. The remaining objections are discussed below.

## V. DISCUSSION

A. Probable Cause.

■ The Court believes the Magistrate correctly concluded that probable cause ex-

isted for the search warrant to be issued for both Queen's and Black's houses.

Defendant Queen states in his objection that the Government failed to meet the totality of the circumstances test established in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In particular, Defendant Queen contends that where information from a tipster is obtained, the reliability of the information must be established. Defendant suggests four methods exist to test the reliability of the information:

(1) Corroborative police work;

(2) Proven reliability of the tipster in the past;

(3) Status of the tipster—whether the tipster is an "unquestionably honest citizen" who comes forward to report criminal activity or if the individual is an accomplice or *jaded lover* who has a motivation to fabricate the information; or

(4) The circumstance attendant to the giving of the information—whether it was given under oath, by way of affidavit, or given as a statement against penal interest.

From the outset, the Court notes that Defendant Queen failed to provide a citation to a case standing for the proposition that a tipster's information must be established by one of these four methods. The Court is hesitant to adopt such an analysis given the United States Supreme Court's rejection of the *Aguilar* and *Spinelli* two-prong test. In rejecting the previous test, the Court was attempting to develop a "practical, common-sense" approach to deciding whether probable cause exists. *See Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. Thus, the Court believes it must examine *all* relevant indicia of reliability and not those four narrow areas proposed by Defendant Queen.

Even if Defendant Queen's approach was adopted, the Court would find probable cause existed. The Court believes the officers corroborated Summey's information to a sufficient degree. There were at least four conversations by officers with Summey. Each of those individual conversa-

tions were consistent with each of the other conversations. Moreover, the interviews were face-to-face giving the officers opportunity to examine Summey's facial and body expressions. Furthermore, the officers had information, which was included in the affidavit, from two other sources that both Defendants were involved in drug activity. *See* Transcript from January 11, 1990 hearing, at 72 (informant of Officer Tommy Wilson) and 74 (Detective Galamore).

Defendant Queen attempts to distinguish *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (per curium) on two grounds. First, the officers in *Upton* knew the girlfriend, but in this case the officers had never met Summey. Second, the girlfriend in *Upton* provided information that was verified by comparison of recent events such as a description of stolen items similar to items that police had already recovered. Defendant Queen argues that Summey's information was not verified.

The Court disagrees that *Upton* is distinguishable. Although the officers did not know Summey prior to the incident, she appeared in person at the police station whereas the girlfriend in *Upton* gave her information over the phone. Hence, the officers in this case had ample opportunity to assess the credibility of Summey. Moreover, the Court believes Summey's information contained such vivid detail as to place upon it an inference of reliability. *See United States v. Darensbourg,* 520 F.2d 985, 988 (5th Cir.1975). Furthermore, the information that the officers did verify such as the description and location of Defendant Queen's house was accurate. Thus, the Court believes that Summey's "story and the surrounding facts possessed an internal coherence that gave weight to the whole," and that the search warrant was supported by probable cause. *See Upton,* 466 U.S. at 734, 104 S.Ct. at 2088–89.

If the search warrant of Queen's house was supported by probable cause, it follows that the search warrant for Black's house was also supported by even more probable cause. The application for that warrant

recalled the successful search of Queen's house and the seizure of over 1500 pounds of marijuana. Thus, the reliability of Summey was confirmed. Moreover, Summey indicated drug records and money was kept at Black's house. The absence of such records and cash at Queen's house supports the inference that those items, necessary for a large scale drug distribution scheme, must have been at Black's house.

The link between Queen and Black was further established by their partnership in American Auto Sales. In addition, the affidavit submitted for the search warrant indicates Summey told officers that Black and Queen traveled to Texas to purchase marijuana. During the search of Queen's house, a recent airline ticket to Texas with both Defendants' names was discovered.

As to both search warrants, the Court agrees with the Magistrate that Defendants have attempted to hold the Government to a standard of proof not required by *Gates*. *See* M & R at 24.

> Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence useful in formal trials, have no place in the Magistrate's decision ... [I]t is clear that only the probability and not a *prima facie* showing of criminal activity is the standard of probable cause. *See Gates*, 462 U.S. at 235, 103 S.Ct. at 2330–31.

Thus, the Court believes that probable cause existed for the issuance of both search warrants.

B. Good Faith Exception.

■ With regard to the search warrants of the houses of Black and Queen, the Magistrate found that the good faith exception enunciated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) would justify the searches, regardless of the absence of probable cause. Both Defendants contend that *Leon* is inapplicable because "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 923.

The Court disagrees with Defendants' contentions. Defendants can only point to one statement made by Officer Hawley that was arguably false. In the affidavit for the search warrant of Queen's house, Hawley said that he "has checked the above information confirming the same and found it to be true and accurate ..." *See* M & R at 15. In fact, Hawley had not conducted a substantial investigation to confirm Summey's story.

The Court does not believe this statement contained a *material* falsehood. Instead, the statement appears to be standard "boiler-plating." Moreover, it is unreasonable to assume that the state magistrate placed a great deal of weight on this statement. Much of the information in the affidavit was attributed to Summey who alone had access to the information. Thus, Hawley could not have checked the accuracy of the information, and the Court believes the state magistrate was aware of this fact.

■ The remainder of Defendants' claims that the affidavit contained false or reckless statements are better characterized as omissions. For example, Defendant Queen contends that Hawley failed to inform the state magistrate that Summey was a "jilted lover." The M & R notes that some courts have considered a jilted lover to be *more* reliable than the average informant because the jilted lover's motivation to "burn" the ex-lover provides adequate incentive for extremely accurate information. *See Upton*, 466 U.S. at 734, 104 S.Ct. at 2088–89; *United States v. Edwards*, 798 F.2d 686, 689 (4th Cir.1986). Thus, it can hardly be said that Hawley's failure to inform the state magistrate that Summey was a "jilted lover" was intended to mislead the magistrate into issuing a search warrant Hawley knew lacked probable cause.

■ The Court believes the Supreme Court intended *Leon* to legitimize searches such as the one in this case. While the officers may have left out some information from the affidavit, it was the job of the magistrate to determine whether additional information was needed to satisfy the prob-

able cause requirement. *See United States v. Edwards*, 798 F.2d 686, 691 (4th Cir.1986). Where the officers exercise good faith, there is not a good reason to punish them by excluding the evidence. *Id.* In other words, the Court does not believe that the exception to *Leon* applies where officers may have been sloppy in preparing the affidavit, but did not intend to intentionally mislead the magistrate through omissions or false statements.

Defendant Black also objects to the conclusion of law that the good faith exception justified the search of his safety deposit box. The Court agrees with the Magistrate's finding that "although Sgt. Farley could have included additional information in the affidavit, his failure to do so does not lessen his good faith reliance on the warrant." *See* M & R at 42. The "technical requirements of elaborate specificity" has no proper place in the reviewing of search warrants. *See Gates*, 462 U.S. at 236, 103 S.Ct. at 2331.

## VI. ORDER

NOW, THEREFORE, IT IS ORDERED:

(1) That the M & R be AFFIRMED and ADOPTED in its entirety;

(2) That the Motions to Suppress the evidence seized at American Auto Sales and a 1978 Chevrolet Z–28 Camaro be DISMISSED as moot; and

(3) That the Motions to Suppress the evidence seized at Black's house, Black's safety deposit box, and Queen's house be, and hereby are, DENIED.

## MEMORANDUM & RECOMMENDATION

PAUL B. TAYLOR, United States Magistrate.

THIS MATTER is before the undersigned Magistrate on reference from the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) to consider motions to suppress evidence filed by Defendants David Rayn Queen and Dale Woodrow Black. The motions to suppress challenge the evidence obtained during the execution of five separate North Carolina state search warrants authorizing the search of 1816 East Garrison Boulevard, Gastonia, North Carolina (Queen's residence); 4721 Can Do Court, Gastonia, North Carolina (Black's residence); safety deposit box # 359 at Branch Banking and Trust Company on Garrison Boulevard, Gastonia, North Carolina (Black's safety deposit box); American Auto Sales, Gastonia, North Carolina (Queen and Black's place of business); and a 1978 Chevrolet Z–28 Camaro located on the premises of American Auto Sales.

On January 11 and 16, 1990, the undersigned conducted hearings to receive evidence and arguments on these motions. During the January 11th hearing, the Government stipulated that it would not offer at trial any evidence obtained from the search of American Auto Sales or the 1978 Chevrolet Z–28 Camaro. Accordingly, the motions to suppress evidence from those two searches are now moot. With regard to the remaining three searches, having fully considered the testimony and arguments presented at the hearings, as well as pertinent legal authorities, the undersigned herewith enters the following findings of fact, conclusions of law and recommendation.

## I. FINDINGS OF FACT

### A. Testimonial Evidence

During the January 11, 1990 evidentiary hearing, the Government offered the testimony of several Gaston County police officers who participated in the investigation of this case, the applications for the search warrants, and the searches. The Defendants offered no testimony in support of their motions. After carefully considering the demeanor of each of the Government's witnesses, the undersigned finds that their testimony, although somewhat disorganized at times, was nonetheless internally consistent and wholly credible. The relevant testimony may be fairly summarized as follows:

(1) *Sgt. R.T. Lytton:*

Sgt. R.T. Lytton of the Gaston County Police Department testified that he was on

duty at the Police Department on Saturday, May 20, 1989 when he received a telephone call at 12:15 p.m. from a woman who identified herself as Myra Summey. Ms. Summey informed Sgt. Lytton that she wanted to report a major drug deal, but that she was afraid her life would be in danger. After Sgt. Lytton informed her that the police would do the best they could to provide her with protection, Ms. Summey told him that David Queen had bought 3500 pounds of marijuana from a man by the name of Gilbert Layle. Ms. Summey informed Sgt. Lytton that Mr. Queen had bales of marijuana in the attic of his home along with "stacks and stacks" of money. Ms. Summey further testified that Mr. Queen had been dealing drugs from his residence at 1816 E. Garrison Avenue in Gastonia, and that she had seen bales of marijuana wrapped in silvery tape in the attic. She further stated that she knew it was marijuana because she had used it before and knew what marijuana looked and smelled like. She further stated that David Queen and his partner, Dale Black, operated a car lot on Bessemer City Road and that they would stack money from their drug dealing at the car lot.

Ms. Summey told Sgt. Lytton that she was making this telephone call because she did not want her child to be around drug dealing and also because she was mad at Queen because she had found him with another woman. Ms. Summey further stated that Queen had recently beaten her.

After receiving the above statement from Ms. Summey, Sgt. Lytton asked her to come to the police station, which she agreed to do. After approximately five minutes, a woman who identified herself as Myra Summey, and who had the same voice as the woman on the telephone, met Sgt. Lytton at the Gaston County Police Department. Ms. Summey brought with her a ledger which she described as being an itemization of the marijuana shipment David Queen had recently received. Ms. Summey also showed Sgt. Lytton various car titles which she stated involved cars that had been bought with drug money. She further stated that Queen had recently bought a large boat with cash from drug proceeds. Ms. Summey stated that Gilbert Layle, a man in Texas, was the supplier for Queen and Black. She repeated that there were "stacks and stacks of money" in the house, and stated that Queen and Black would bring money into the house and take marijuana out of the attic. She stated she observed Queen and Black cut open the bales in the kitchen and put marijuana in smaller Ziploc bags. She described the marijuana bales as being wrapped in silver duct tape. She stated that she understood that this drug dealing had been going on for several months but that she personally did not know about it until March of 1989. She stated that Queen would keep the marijuana at his house, and Black would keep the money at his house. Queen frequently talked about his marijuana business with Black in Ms. Summey's presence and told her that Black had received a lot of money from a lawsuit and used it to get started in the drug business. Ms. Summey told Sgt. Lytton that Queen and Black would bring marijuana to North Carolina from Texas in a U–Haul.

Ms. Summey further testified that within the past 72 hours, she had seen numerous marijuana bales in Queen's attic, and informed Sgt. Lytton that the police would have to hurry to get the marijuana because she believed Queen was about to move it. Her reason for this belief was that she had gotten into a fight with Queen and he had thrown her down the attic stairs. Ms. Summey showed Sgt. Lytton several bruises on her body which she claimed were the result of being thrown down the stairs. Also during this argument, Ms. Summey told Queen that she was going to the police, and Queen responded that he would move the marijuana out of his house in a used furniture box.

When describing Queen's residence, Ms. Summey informed Sgt. Lytton that his house was located at 1816 E. Garrison Street, Gastonia, and that there was a boat in the driveway and a blue Nova in the carport. She further identified Black's residence as being 4709 Can Do Court.

After conducting this interview with Ms. Summey, Sgt. Lytton drove by the house at

1816 E. Garrison Street and observed a boat in the driveway along with a blue Nova in the carport. He also saw the numbers 1816 on the front door. While looking at the house, Sgt. Lytton got a radio dispatch to call Ms. Summey at her father's house. Sgt. Lytton drove to Ms. Summey's father's house and spoke with her there. At this time, Ms. Summey informed Sgt. Lytton that she had just talked to Queen by telephone and he said that he was going to be at home watching the Celtics game on television. Sgt. Lytton returned to the police department and began to call several vice officers to bring them in on the case. Shortly after 2:30 p.m., Detective Hawley of the Vice Department came into the Police Department. Sgt. Lytton called Myra Summey and asked her to return to the Police Department, which she did. At this time, Sgt. Lytton introduced Ms. Summey to Det. Hawley and Sgt. Edwards, who had also just arrived, and informed them of the extent of his investigation to that point.

On cross-examination, Sgt. Lytton stated that he had never met Ms. Summey before and that he did not participate in the search warrant applications.

(2) *Det. Daniel Hawley:*

Det. Daniel Hawley of the Gaston County Police Department testified that he went to the Gaston County Police Department on May 20, 1989 to meet Sgt. Lytton with regard to a marijuana investigation. At the Police Department, Sgt. Lytton introduced Myra Summey to Det. Hawley. Shortly thereafter, Sgt. Edwards came into the Police Department and joined them.

Det. Hawley and Sgt. Edwards talked to Ms. Summey alone at some time after 3:00 p.m. During this interview, Ms. Summey told them that she used to live with Queen in Maiden, North Carolina, and that in Maiden, Queen used to run the Classic Auto Sales. In February 1989, Queen moved to Garrison Boulevard in Gastonia and asked Ms. Summey not to move with him. She later moved in with Queen in March of 1989 at the Garrison Boulevard address. Since March of 1989, Ms. Sum-

mey had heard numerous conversations regarding marijuana dealing between Queen and Black, and a third man by the name of Kenny Harrelson. Black and Queen would come to the 1816 Garrison Boulevard address with suitcases full of money and would count it in the kitchen. She also had seen Black and Queen bring bales of marijuana to the kitchen, cut them open, fill small Ziploc bags with marijuana, and then stack the Ziploc bags into larger garbage bags. On one occasion, Ms. Summey's 8- or 9-year-old son went into the kitchen when Queen, Black and Harrelson were there breaking up a bale of marijuana. Queen got angry at the child and chased him out of the kitchen. Queen later told Ms. Summey to keep the kid out of the kitchen when they were cutting marijuana so that he would not tell other kids at school and cause the police to come. As a result of Queen's marijuana dealing, Ms. Summey began to have problems in her relationship with him. During the week prior to May 20, 1989, Ms. Summey and her child moved out of Queen's home. On Thursday, May 18, 1989, (two days before Ms. Summey's report to the police) Ms. Summey went to Queen's house to talk about their problems. Queen stated that the problem had been taken care of and that the marijuana was all gone. Ms. Summey stated she wanted to see for herself and went up to the attic. When she got into the attic, she saw 15 to 18 bales of marijuana, several one-pound bags of marijuana, and some scales. These bales were wrapped in the same silver material that she had seen wrapped around other bales which had been broken up in the kitchen. At this time, Queen became angry at Ms. Summey and threw her down the attic steps.

Ms. Summey stated that Black and Harrelson would bring suitcases of money, perhaps thousands or hundreds of thousands of dollars, to the house. She further stated that Queen and Black's car lot was just a front and that they didn't make enough money to live on from their car lot operation. Ms. Summey had heard Queen and Black discuss that it was best if the money

and marijuana were not kept at the same location.

At the time of his interview with Ms. Summey, Det. Hawley was aware of information from Det. Galmore that Queen and Black were suspected of being involved in prior drug deals.

Ms. Summey told the officers that she knew what marijuana looked and smelled like. During the interview, Ms. Summey was extremely excited and nervous. She kept telling the officers that they would have to hurry because Queen was going to get rid of the marijuana.

After interviewing Ms. Summey, Det. Hawley prepared a search warrant application for Queen's house and presented it to a state magistrate. After securing a search warrant from the magistrate, Det. Hawley and several other officers went to Queen's residence at 1816 E. Garrison Boulevard and knocked at the door. When Queen answered the door, the officers identified themselves and showed him the search warrant. Queen responded that he had been expecting them.

Upon searching the house, the officers found in the attic 46 bales of marijuana wrapped in silver-gray duct tape, 21 empty wrappers with duct tape attached to them, 14 one-pound bags of marijuana, various scales, baggies, duct tape and other miscellaneous containers. In a den closet, the officers found a shotgun. On Queen's person, the officers recovered $840.00 in cash. The total weight of all the marijuana seized from Queen's residence was 1,420 pounds.

Det. Hawley further testified that television news crews were present during the search of Queen's house and that they ran a story about the search on television that night.

Det. Hawley returned to the Police Department at approximately 9:00 p.m. Earlier in the evening, Det. Hawley had received a dispatch through which he was informed that Ms. Summey had called the police and complained of being threatened by Queen's family. Upon returning to the station, Det. Hawley called Ms. Summey and asked her to return to the Police Department. When she arrived, Ms. Summey informed Det. Hawley that Queen's mother had come to Ms. Summey's father's house and made several threats. To get rid of her, Ms. Summey's father had fired a shot into the air.

After returning to the Police Department, Det. Hawley began drawing up a search warrant application for Black's residence. At this time, Det. Hawley again talked to Ms. Summey who told him that Black would keep all of the drug money at his house. She also stated that he kept records of the drug transactions either at his house or at his car dealership. Ms. Summey stated that Black lived on Can Do Court and described his house as being either the fourth or fifth house on the right with a double-car garage to the rear and a concrete drive. She further stated she believed it was 4721 Can Do Court. Sgt. Ivey of the Gaston County Police Department drove to Can Do Court and found the house described by Ms. Summey.

Ms. Summey further told Det. Hawley that Queen and Black had flown to Texas within the past 60 days. During the search of Queen's house, the police had found airline tickets in the name of Queen and Black for a round-trip flight to Texas. Ms. Summey stated that Queen and Black went to Texas to conduct drug transactions and that Queen had personally told her this.

After interviewing Ms. Summey, Det. Hawley prepared a search warrant application for Black's house and submitted it to a state magistrate. After obtaining a search warrant, Det. Hawley drove to Black's residence and arrived at approximately 12:20 a.m. on May 21, 1989. When Det. Hawley arrived, there were already two police officers there. Det. Hawley served the search warrant on Mrs. Black and then participated in a search of the house.

Upon searching the house, garage, and a car in the garage, the police officers found several papers in the master bedroom which appeared to be drug records; $2,500 in a bedroom dresser drawer; $52,500 in a brown grocery bag in the kitchen cabinet; $76,520 in a brown duffle bag behind the seat of a yellow Corvette in the garage;

$42,920 in a compartment under the duffle bag in the Corvette; $1,225 in a Crown Royal bag in a chest-of-drawers in the master bedroom; $15,695 in a Crown Royal bag underneath the chest-of-drawers in the master bedroom; $5,000 in an inside pocket of a suit hanging in a hall closet; and a small bag of marijuana in a cabinet above the stove in the kitchen. Elsewhere in the house, the officers found a .357 Magnum revolver, cigarette rolling machines, and bank records from various banks. In a wooden shed behind the house, the officers found three one-pound bags of marijuana.

At the same time the officers were searching Black's residence, several other officers were conducting a search pursuant to a search warrant of Black and Queen's business, American Auto Sales. The application for the search warrant for this business location contained the exact same statement that Det. Hawley had used to obtain the search warrant for Black's house.

On cross-examination, Det. Hawley stated that he did not know Ms. Summey or Queen before this incident, he did not have Ms. Summey swear to an affidavit, nor did he tell her that she could be subject to prosecution for making a false police report. He further conceded that he had no evidence other than Ms. Summey's statement that Ms. Summey had ever lived with Queen, nor did he know that Queen lived at the house on Garrison Boulevard except through Ms. Summey's statements. Det. Hawley did not interview Ms. Summey's son before obtaining any of the search warrants. Det. Hawley had heard on an earlier occasion from Officer Wilson that an informant had provided information that marijuana was going to be unloaded from a Ryder truck at Black and Queen's car lot. With regard to Black's house, Det. Hawley testified that Ms. Summey had said that she had never been inside Black's house. Det. Hawley conceded that there were no statements in the search warrant affidavits with regard to cash being located at Black's residence or American Auto Sales.

In a later search of Black's safety deposit box at Branch Banking and Trust, the police found $40,000 in cash contained in a Crown Royal bag and a certificate of deposit in the amount of $159,000. The cash was seized by the police, but the certificate of deposit was returned to Defendant Black.

(3) *Douglas Ivey*:

Douglas Ivey, a detective sergeant with the Gaston County Police Department testified that he drove to 4721 Can Do Court in Gaston County on May 20, 1989 to confirm the location of the house described by Ms. Summey and to watch it until a search warrant was prepared. Det. Ivey arrived at the house at approximately 9:00 p.m.

At the time he was dispatched to Black's house, Det. Ivey was aware of the earlier search of Queen's house and seizure of marijuana, and that the search of Queen's house had been on the television news. Ivey was also aware that Black's house was going to be searched for documents and records regarding marijuana trafficking.

Ivey waited in the driveway of 4721 Can Do Court with Patrol Officer Hamrick until approximately 11:00 p.m. when Theresa Black arrived with her children. Det. Ivey identified himself to Mrs. Ivey and explained that a search warrant was being prepared for her house to search for documents and records regarding marijuana trafficking. Ivey further told Mrs. Black about the search of Queen's house and that there was a search warrant on the way for the Black residence.

Ms. Black was concerned about putting her children to bed and wanted to go into the house. However, Det. Ivey felt that because documentary evidence could easily be destroyed, he would have to accompany Mrs. Black into the home. Det. Ivey and Patrol Officer Hamrick went into the house with Mrs. Black and waited while she put her children to bed. Ms. Black then came to the kitchen where the three of them sat for approximately an hour and a half until the other officers arrived with a search warrant.

**(4)** *Officer William Farley*:

Sgt. William Farley of the Gaston County Police Department testified that he spoke to Myra Summey on May 22, 1989. At this time, Sgt. Farley was aware of the earlier searches that had been conducted at the Black and Queen residences. Myra Summey told Sgt. Farley that Black kept a safety deposit box for the purpose of holding money from his drug deals, and that she knew this information from conversations she had overheard between Black and Queen where they talked about selling marijuana and putting money into a safety deposit box. Based on this information, Sgt. Farley called several bank employees to locate a lock box in the name of Black or Queen.

Sgt. Farley was aware that information provided to the police by Ms. Summey with regard to the Black and Queen residence had in fact proven true and reliable. Sgt. Farley was also aware that money seized at Black's residence had been contained in several Crown Royal bags.

After locating a safety deposit box for Black at Branch Banking and Trust, Sgt. Farley obtained a search warrant. At some point during the preparation of the search warrant application, Sgt. Farley was informed that Black's mother or mother-in-law was attempting to get into the safety deposit box. Sgt. Farley informed the bank employee that a search warrant was being prepared and that no one was to have access to the safety deposit box.

Upon searching the safety deposit box, Sgt. Farley found a certificate of deposit made out in the amount of $159,902.23 and four Crown Royal bags each containing $10,000 in cash.

On cross examination, Sgt. Farley stated that he did not know how recently Ms. Summey had overheard Black and Queen talking about putting money from drug sales into the safety deposit box.

**B.** *The Search Warrant Applications*

**(1)** *1816 E. Garrison Blvd. (Queen's Residence):*

On May 20, 1989, a North Carolina state magistrate issued a search warrant for the residence of David Rayn Queen at 1816 East Garrison Boulevard, Gastonia, North Carolina. In the application for this search warrant, Detective D.K. Hawley of the Gaston County Police Department submitted the following affidavit:

Applicant states that he is a Detective assigned to the Special Investigation Unit (SIU) of the Gaston County Police Department assigned to work drug and other vice related crimes. Applicant has been a police officer in Gaston County for over 12 years, over 9 years with the County Police. Applicant possesses an Advanced Certificate in Criminal Justice and has numerous hours investigative training including drug investigations. Applicant is familiar with persons and places involved in drug activities in Gaston County and the habits of such persons and places.

On this date Sgt. R.T. Lytton received a phone call from Myra Summey who subsequently came to the Gaston County Police Dept. and met with Sgt. Lytton personally. Sgt. Lytton then contacted Det. D.K. Hawley and Sgt. J.F. Edwards who were introduced to Ms. Summey and obtained the following information from her:

Ms. Summey states that shehas (sic) lived with the subject, David Rayn Queen, at Queen's rental residence located at 1816 Garrison Blvd. since March 1989. Prior to this Ms. Summey lived with Queen at Rt. 1, Maiden, N.C. since August 1988. Queen moved to the Garrison Blvd. address in Feb. 1989 and Ms. Summey moved in with him once again approximately 2 weeks later. After moving back in with Queen, Ms. Summey noticed that several of Queen['']s friends started frequeting (sic) the residence and would bring large amounts of money. Ms. Summey also observed bails (sic) of Marijuana being broken down by Queen and his friends into pound bags and other quantities, tagged and carried out by Queen['']s friends. Ms. Summey has personally observed several bails (sic) of marijuana stored in the attic of the residence wrapped in silver grey tape. Ms.

Summey observed this approximately 72 hours ago and estimated that there were between 16 and 18 bails (sic) at that time. Ms. Summey states that she personally knows what marijuana looks like and smells like.

This applicant states he has checked the above information confirming same and found it to be true and accurate and this applicant states he has reason to believe that Ms. Summey is being truthful in her information.

Applicant further states that for the past five months the Gaston County Police Dept. and the Gastonia Police Departments have been receiving information from various sources concerning the activities of David Queen and have been investigating.

In addition, Det. Tony Wilson of the Gastonia Police Dept. has relayed to applicant that he has received information from a confidential reliable informant who has provided information to Wilson on Queen and American Auto Sales, which Queen is co-owner, that confirms the basic general information given by Ms. Summey.

Based on the above stated facts and applicant[']s experience and training, applicant has reason to believe that the controlled substance marijuana is being possessed at the residence describe[d] at this time and request[s] a search warrant be issued.

(2) *4721 Can Do Court (Black's Residence)*:

On May 20, 1989, a North Carolina state magistrate issued a search warrant for the home of Dale Woodrow Black located at 4721 Can Do Court, Gastonia, North Carolina. In the application for this search warrant, Det. D.K. Hawley of the Gaston County Police Department submitted the following affidavit:

Applicant states he is a detective assigned to the Special Investigations Unit of the Gaston County PoliceDept. (sic) assigned to work drug related crimes. Applicant has been a ploice (sic) officer in Gaston Countyfor (sic) the past 12 years and the past 9 years with the Gaston County Police Dept. and 2years (sic) experience as a narcotics officer. Applicant possesses an Advanced Law Enforcement Certificate and has received numerous hours training including drug investigations. Applicant states he is familiar with drug traffickers in Gaston County and the investigations thereof.

Applicant states that on 5–20–89 he received information from a white female known as Myra Summey that led toa (sic) search warrant for the residence of David Queen, 1816 Garrison Boulevard. Queen being a former boyfriend of Ms. Summey. The search warrant was executed and as a result over 1500 pounds of Marijuana was seized and Mr. Queen arrested.

Applicant states further that Myra Summey also stated that David Queen was in partnership both in the trafficking of marijuana and the used car business with a W/M known as Dale Woodrow Black of Can Do Ct., Gastonia. The used car business Queen is partners withe (sic) Black in is American Auto Sales located at the intersection of N.C. 274 and N.C. 275, Gastonia, N.C. Summey stated that the records for the drug transactions were kept at either or both Black's residence or American Auto Sales.

Applicant states that there appeared to be no record of the drug transactions kept at David Queen's residence.upon search (sic) by the Gaston County Police.

Myra Summey stated that Dale Black and David Queen had flown to Texas together within the past 60 days with several thousand dollars to pay for drug transactions. Some of the papers seized during thesearch (sic) of David Queen's residence were two American airline tickets to Texas in the names of David Queen and Dale Black dated March 18, 1989.

Applicant states that Myra Summey has proven her reliability to this applicant in that everything she has stated thus far has been accurate and reliable.

Applicant states that based on all the above information and the excellant (sic) reliability of Myra Summey that thisap-

plicant (sic) has reason to believe th-t (sic) papers, records and documents pertaining to drug trafficking is being kept inside the above stated location and applicant requests a serach (sic) warrant be issued for the seizure of records, papers and documents.

(3) *Safety Deposit Box #359, Branch Banking & Trust Company (Black's Safety Deposit Box):*

On May 22, 1989, a North Carolina state magistrate issued a search warrant for safety deposit box #359 at the Garrison Boulevard branch of Branch Banking and Trust Company in Gastonia, North Carolina. In the application for this search warrant, Sgt. William Farley of the Gaston County Police submitted the following affidavit:

The applicant is a detective assigned to the Special Investigation Unit of the Gaston County Police Department. The applicant has been employed by the Gaston County Police for over six years. During this time the applicant has receivedtraining (sic) and instruction in the field of law enforcement and in particular specific training and instruction relating to controlled substance violations and investigations. The applicant is certified and has received his Advanced Law Enforcement Certificate from the North Carolina Criminal Justice Training and Standards Commission.

The applicant states that he has received information from a confidential and reliable source of information. (Hereafter refered (sic) to as CRI). The CRI has given truthful and accurate information in the past, has never given false information to any officer. The CRI has given information which has led to both arrests and seizure of controlled substances. The CRI has no reason to be untruthful in this matter.

The CRI has described a safety deposit box located at the BB & T on Garrison Blvd. The CRI has described the contents of this box to be cash, proceeds from narcotic sales, specifically marijuana. The CRI knows this through conver-

sations with and conversations heard involving Dale Black and David queen.

The applicant states that he is familiar with the modus operandi of narcotic suppliers, and knows that the concealment of monies within safety deposit boxes is a common practice. The CRI states that he has spoken to bank officials who have confirmed the existence of this box and also the persons to whom it is listed. Based on the information contained herin (sic), this officer[']s own knowledge and experience, the applicant believes that monies from the sale of controlled substances, personal papers including the records of these sales as well as other items related to thisinvestigation (sic) are contained within the safety deposit box described above and respectfully requests that a search warrant be issued.

## II. CONCLUSIONS OF LAW

### A. The Search of Queen's Residence

In support of his motion to suppress, Defendant Queen argues (1) that there was insufficient probable cause for the issuance of the search warrants; (2) that, assuming the good faith exception of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) applies, the Government is prevented from relying on that exception due to material misrepresentations and omissions in the search warrant applications; and (3) that because the North Carolina Supreme Court has held in *State v. Carter,* 322 N.C. 709, 370 S.E.2d 553 (1988) that the North Carolina Constitution does not permit a good faith exception to the lack of probable cause in a search warrant application, that the good faith exception should not be permitted in this case.

(1) *Probable Cause:*

Defendant Queen first argues that the police had insufficient probable cause to obtain a search warrant for his house. In essence, Queen's complaint is that the officers unreasonably relied on the statement of Myra Summey, a witness of unknown reliability, without corroborating her story by further investigation. Queen further argues that Ms. Summey's reliability

should have been drawn into question by the officers because of her apparent anger from her recent break-up with David Queen.

In attacking the search warrant affidavit, Queen focuses not on what is contained in the affidavit but, rather, on what is missing. Queen points out that the officers did not require Ms. Summey to make a sworn statement; they did not talk to any other witnesses, including Ms. Summey's son; and they did not confirm by independent evidence the fact that Ms. Summey ever lived with Queen or that the house at 1816 E. Garrison was even occupied by Queen.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court abandoned the strict two-prong test for probable cause in search warrant applications established by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), in favor of a more flexible "totality of the circumstances analysis." Under this new test,

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. 462 U.S. at 238–39, 103 S.Ct. at 2332.

A year later in *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court reiterated its holding in *Gates* and upheld a search warrant on facts quite similar to those in the present case. In *Upton,* a police officer had obtained a search warrant after reciting in an affidavit the fact that he had received a telephone call from the Defendant's girlfriend who identified herself and the defendant by name, and described the

location of a house trailer where specific items taken in a recent burglary could be found. The woman further indicated knowledge of a recent police raid on a motel room that was related to the burglary and stated that because of the raid, the evidence in the trailer was about to be moved. The affidavit further recited that the woman stated she had recently broken up with the defendant and wanted to "burn him." Although the woman admitted her name to the police officer when he asked if she was the Defendant's girlfriend, she declined to leave a telephone number or address where she could be reached. On these facts, the Supreme Court upheld the issuance of the search warrant for the house trailer.

In reversing the Supreme Court of Massachusetts, the Supreme Court held that the lower court had failed to properly apply the "totality of the circumstances analysis" adopted in *Gates* and "also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant." 466 U.S. at 732, 104 S.Ct. at 2088. On this latter point, the Supreme Court observed that "[a] deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." 466 U.S. at 733, 104 S.Ct. at 2088.

In finding that the facts summarized above established probable cause, the Supreme Court further observed that

> [i]n concluding that there was probable cause for the issuance of this warrant, the Magistrate can hardly be accused of approving a mere "hunch" or a bare recital of legal conclusions. The informant's story and the surrounding facts possessed an internal coherence that gave weight to the whole. Accordingly, we conclude that the information contained in [the officer's] affidavit provided a sufficient basis for the "practical, common-sense decision" of the Magistrate. "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to warrants." 466 U.S. at 734, 104 S.Ct. at 2089, *citing, United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

In the present case, Det. Hawley's affidavit identified Myra Summey by name and revealed that she voluntarily telephoned, and then personally visited, the police station to report a crime. During her interview with vice officers at the station, Ms. Summey reported that she had been living with David Queen at 1816 Garrison Boulevard since March 1989; that after moving in, she observed Queen's friends bringing large sums of money to the house, and further observed Queen and his friends breaking down bales of marijuana into pound bags and other quantities; that she observed the friends carrying the marijuana bags out of the house; that the marijuana bales would be wrapped in silver duct tape and stored in the attic; that she had seen 16 to 18 marijuana bales in the attic within the past 72 hours; and that she knows what marijuana looks and smells like.

Although Ms. Summey had never before provided information to the police, her statement nonetheless could reasonably be viewed as reliable. Unlike the telephone tipster in *Upton, supra,* who would not provide a telephone number or address to the police, Ms. Summey personally visited the police station and identified herself. Under these circumstances, and despite Defendant Queen's arguments to the contrary, the undersigned finds Ms. Summey to be more in the nature of a "citizen eyewitness" reporting a recent crime, rather than a tipster or confidential informant. As a citizen reporting a crime she had personally witnessed within the recent past, her reliability need not be established by prior experience in providing information to the police. *See, e.g., United States v. Edwards,* 798 F.2d 686, 689 (4th Cir. 1986) wherein the Fourth Circuit cited with approval the Second Circuit's holding in *United States v. Burke,* 517 F.2d 377, 380–81 (2d Cir.1975) that "a showing of previous reliability is inapplicable to statements supplied by victims of or witnesses to crim-

inal activity." *See also,* LaFave, *Search and Seizure,* Vol. I, Section 3.4, pp. 712–49 (1987) and cases cited therein.

Secondly, the detailed nature of the information she provided further substantiated her basis of knowledge for the information she was providing. She did not merely accuse Queen of drug dealing. She recounted having witnessed the specific operation of storing marijuana bales wrapped in silver duct tape in the attic, breaking down the bales into one-pound bags, selling the bags to various friends who would frequent the house, and identified Queen by name and provided the precise street address of the house where all of this occurred and where she had been living with Queen. As the Supreme Court noted in *Spinelli, supra,* "[a] magistrate, when confronted with such a detail, could reasonably infer that the informant had gained his information in a reliable way." 393 U.S. at 417, 89 S.Ct. at 589.

Defendant Queen argues that Ms. Summey's relationship with him, and the fact that she had lived with him in the house that was to be searched cast considerable doubt on her credibility. The undersigned does not agree. The existence of a relationship between Ms. Summey and Queen, and the fact that it had deteriorated, equally supports a motive on Ms. Summey's part to provide the police with extremely accurate and damaging information regarding Queen's drug dealing in order to punish him for the breakup of the relationship. *See United States v. Hodges,* 705 F.2d 106, 108 (4th Cir.1983) ("Although the record discloses that Hodges and Long separated, we are not persuaded that it is proper to infer a lack of credibility from this fact alone. Even if we accept the inference that Long harbored ill will toward Hodges, her credibility could not be rejected on this ground.") *See also, Massachusetts v. Upton, supra* 466 U.S. at 734, 104 S.Ct. at 2088 ("and she provided ... a motive for furnishing the information—her recent breakup with Upton and her desire to 'burn him.'") Ms. Summey's motive to likewise "burn" Queen for the breakup of the relationship by providing accurate information

to the police is even more likely in a case, as here, where the complaining witness has personally gone to the police station and provided such a detailed statement of the Defendant's drug dealings.

Although the police officers could have obtained further information from independent sources to verify that Ms. Summey did, in fact, live at 1816 Garrison Avenue, such information would have been mere surplusage in the showing of probable cause. Indeed, there is no requirement that the police officers rule out all possibility that a complaining witness has fabricated an elaborate story simply to have the police raid an unsuspecting person's house. Nor is there any requirement that the police officers attempt to prove by independent evidence that Ms. Summey's story is accurate beyond all doubt. As the Supreme Court observed in *Illinois v. Gates, supra,*

> Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the Magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that only the probability and not a *prima facie* showing, of criminal activity is the standard of probable cause." 462 U.S. at 235, 103 S.Ct. at 2330.

In essence, the Defendant's complaints regarding what the officers did not do with regard to obtaining further information, simply go to a failure to establish beyond a reasonable doubt that Ms. Summey's story was reliable. Such a showing is not required to establish probable cause for the issuance of a search warrant.

Giving due deference to the decision of the issuing magistrate in this case, and in light of Ms. Summey's status as an eyewitness to recently occurring criminal activity, together with the detailed statement of that activity she provided to the police, the undersigned finds that "the evidence viewed as a whole provided a 'substantial basis' for the magistrate's finding of probable cause." *Massachusetts v. Upton,* 466

U.S. at 732–33, 104 S.Ct. at 2088. Accordingly, the motion to suppress the evidence seized from Queen's residence at 1816 Garrison Boulevard on the grounds that the search warrant was not supported by probable cause is without merit and should be denied.

(2) *The Good Faith Exception to the Lack of Probable Cause:*

Although the undersigned has found above that there was a substantial basis for the magistrate's finding of probable cause, even if it were determined that such was not the case, the search of Queen's residence can be upheld under the good faith exception.

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the United States Supreme Court held that where police officers reasonably rely on a warrant to conduct a search, no valid purpose would be served by excluding evidence seized thereby if it is later determined that the magistrate had made an erroneous probable cause determination. Also known as the "good faith exception," this doctrine prevents the suppression of evidence seized pursuant to a warrant where the police officers relied on that warrant in good faith. Indeed, as the Court held, "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." 468 U.S. at 926, 104 S.Ct. at 3422.

Defendant Queen argues that the officer who obtained the search warrant for his residence acted in bad faith by (1) stating in the affidavit that he had checked and confirmed the information provided by Ms. Summey, when in fact he had not; (2) failing to inform the magistrate of Ms. Summey's recent breakup with Queen; (3) suggesting that Ms. Summey was still living with Queen at the time of the search warrant application; and (4) failing to inform the Magistrate of contradictory evidence from another source that the marijuana was at a location other than Queen's residence.

With regard to the first claim, Defendant Queen specifically cites Det. Hawley's statement in the search warrant affidavit that

This applicant states he has checked the above information confirming the same and found it to be true and accurate and this applicant states he has reason to believe that Ms. Summey is being truthful in her information.

At the evidentiary hearing, Det. Hawley was unable to articulate specifically how he checked or confirmed Ms. Summey's statement as represented in the affidavit. Although Det. Hawley misrepresented in the affidavit that he had verified Ms. Summey's statement, such a vague representation does not diminish all the other evidence the police had to support a reasonable belief that numerous bales of marijuana were present at Queen's residence. Indeed, in addition to the other information contained in the affidavit, Det. Hawley was aware that Ms. Summey had confronted Queen about the marijuana and had been thrown down the attic steps, sustaining bruises which she showed to the officers, and that Officer Lytton had driven by 1816 Garrison Avenue and observed the car and boat in the driveway which had been described by Ms. Summey.

In short, Det. Hawley's conclusory statement that he had checked and confirmed Ms. Summey's story, without specifying how he checked and confirmed her story, offers nothing of value toward the finding of probable cause and fails to detract in any way from all the other information the officers had in this investigation. Nor is it likely that such information misled the magistrate into issuing a search warrant where he otherwise would not have done so. Accordingly, Det. Hawley's misrepresentation, while improper, does not establish that the officers unreasonably or in bad faith relied on the search warrant to search Queen's residence.

With regard to Queen's second point, that Det. Hawley improperly failed to inform the magistrate of Ms. Summey's breakup with Queen, the undersigned likewise finds that this fact does not create bad faith on the part of the officers. As pointed out above, the existence of a broken relationship or ill will between an informant and the subject of a search warrant does not lessen the credibility of the informant and may, instead, reveal a genuine motive for the informant's production of information to the police. *See United States v. Hodges, Massachusetts v. Upton, supra.* Moreover, because the affidavit revealed that Ms. Summey, the source of the information against Queen, had lived with Queen since August of 1988, common sense would have led the magistrate to conclude that Ms. Summey was, for whatever reason, intent upon exposing the man she lived with to substantial felony drug prosecution. On such facts, Ms. Summey's antipathy towards Queen is apparent, and it defies reason to argue that Det. Hawley deliberately and in bad faith concealed the fact of Ms. Summey's breakup with Queen from the magistrate.

In his third argument, Queen complains that Det. Hawley drafted the search warrant in a way to make it appear that Ms. Summey was still residing with Queen at the time the search warrant application was prepared. To the extent that such a misimpression was created, it is of no significance because the facts reveal that Ms. Summey had lived with Queen over an extended period of time and had observed a continuous and ongoing marijuana operation. Moreover, the affidavit specifically recites that Ms. Summey had observed 16 to 18 bales of marijuana being stored in the attic approximately 72 hours prior to the submission of the search warrant application. In light of these specific facts, whether or not Ms. Summey was still living with Queen or had recently moved out is simply of no relevance either to the issue of probable cause, or to the officers' good faith reliance on the other information in the case which they reasonably believed established probable cause.

In his final argument, Defendant Queen submits that Det. Hawley failed to inform the magistrate of evidence he had received from another informant that, on a prior occasion, marijuana was going to be delivered to Queen's business address at Ameri-

can Auto Sales. This claim is likewise without merit. Although the officers had some knowledge through another informant that Queen and Black had arranged on a prior occasion for the delivery of marijuana to their place of business, such information in no way contradicts Ms. Summey's statement that she had seen 16 to 18 bales of marijuana in Queen's attic within the past 72 hours. If anything, such information merely confirms Ms. Summey's other statement that the marijuana dealing had been going on for several months. Accordingly, the officer's failure to inform the magistrate that the police had received information from another informant that Black and Queen had once arranged on a prior occasion to have marijuana delivered to their place of business does not constitute bad faith on the part of the officers or in any way impugn the reasonableness of their reliance on the warrant to search Queen's residence.

Accordingly, for all the reasons set forth above, Defendant Queen's motion to suppress on the grounds that Det. Hawley acted in bad faith in relying on the search warrant is without merit and should be denied.

(3) *The Good Faith Exception Under North Carolina Law*:

In his final argument, Defendant Queen asserts [1] that if probable cause was lacking for the issuance of the search warrant, the Government would be barred from relying on the good faith exception in this case because the North Carolina Supreme Court has held in *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988), that it does not recognize a good faith exception to the requirement of probable cause in a search warrant application. With this mandate from the North Carolina Supreme Court, and citing *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), Defendant Queen argues that evidence obtained by state police officers in violation of his constitutional rights may not be introduced into evidence in federal court. This argument blurs a critical distinction and ignores the specific holding of the United States Supreme Court in *Elkins*.

In *Elkins*, the Supreme Court held that

Evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the *Fourth Amendment* is inadmissible over the defendant's timely objection in a federal criminal trial. 364 U.S. at 223, 80 S.Ct. at 1447 (emphasis added).

Upon careful examination of the language in *Elkins*, it is clear that the Supreme Court limited its holding to the proposition that evidence obtained by state officers in violation of a defendant's Fourth Amendment rights under the *United States Constitution* would be inadmissible. However, this holding does not prohibit the use in federal court of evidence obtained in violation of a defendant's rights under *state* statutory or constitutional law. As the Supreme Court later observed in *Elkins*, "[t]he test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." 364 U.S. at 224, 80 S.Ct. at 1447. *Accord, On Lee v. United States*, 343 U.S. 747, 754–55, 72 S.Ct. 967, 972–73, 96 L.Ed. 1270 (1952) ("But here neither agent nor informer violated any federal law; and violation of state law, even had it been shown here, as it was not, would not render the evidence obtained inadmissible in federal courts."). Indeed, every circuit court which has addressed the issue has held that evidence obtained in violation of state law, including state constitutional rights, is nonetheless admissible in a federal prosecution if properly obtained under federal law. *See, United States v. D'Antoni*, 874 F.2d 1214, 1218–19 (7th Cir.1989) ("federal standards govern the admissibility of evi-

---

**1.** At the January 16th hearing, Mr. James Gray, counsel for Defendant Black, presented the argument regarding the North Carolina Supreme Court's rejection of the good faith doctrine as a matter of North Carolina constitutional law. At the conclusion of Mr. Gray's presentation, counsel for Defendant Queen stated that he also joined in that argument.

dence."); *United States v. Chavez–Vernaza*, 844 F.2d 1368, 1373–74 (9th Cir.1987) ("federal courts are not bound by state statutory or constitutional provisions when determining whether evidence obtained by state officers in apparent violation of state law must be excluded in federal court."); *United States v. Pforzheimer*, 826 F.2d 200, 202–03 (2d Cir.1987) ("evidence admissible under federal law cannot be excluded because it would be inadmissible under state law."); *United States v. Mitchell*, 783 F.2d 971, 973–74 (10th Cir.), *cert. denied*, 479 U.S. 860, 107 S.Ct. 208, 93 L.Ed.2d 138 (1986) ("The issue in this case is one under the Fourth Amendment and exclusion of evidence would only be warranted if there were a violation of the Constitution of the United States."); *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir.1985) ("The fact that Michigan Law may now require greater protection against searches and seizures than the Fourteenth Amendment is of no avail to a defendant in federal court, under prosecution for a federal crime."); *United States v. Quinones*, 758 F.2d 40, 43 (1st Cir.1985) ("evidence admissible under federal law cannot be excluded because it would be inadmissible under state law."); *United States v. Rickus*, 737 F.2d 360, 363–64 (3rd Cir.1984) ("Evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law."); *United States v. Mastrangelo*, 733 F.2d 793, 799 (11th Cir.1984) ("The admissibility of evidence in a federal prosecution is governed by federal law, rather than state law."); *United States v. Castillo*, 449 F.2d 1300, 1301 n. 2 (5th Cir.1971) (evidence seized in violation of state law not deprived of its admissibility in federal court.).

On the basis of the foregoing authorities, the North Carolina Supreme Court's rejection of a good faith exception as a matter of North Carolina constitutional law is inapplicable in this federal court prosecution. Further, inasmuch as the United States Supreme Court has sanctioned the good faith doctrine in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), that principle will be applied in this case as a matter of federal law. Accordingly, the defendant's challenge to the good faith doctrine is without merit, and his motion to suppress on this ground should be denied.

### B. The Search of Black's Residence

In support of his motion to suppress, Defendant Black argues (1) that the search warrant affidavit failed to establish probable cause to believe that drug records were located at his house; (2) that because the North Carolina Supreme Court has rejected the good faith exception to the requirement of probable cause in a search warrant application, that doctrine should not be available to save the warrant in this case; and (3) that Sgt. Ivey illegally seized his house before the search warrant had issued.

### (1) *Probable Cause*:

The essential facts contained in Det. Hawley's affidavit in support of the search warrant for Black's residence may be summarized as follows: As of the time of Det. Hawley's affidavit, a search warrant based on information provided by Ms. Summey had been executed on the residence of David Queen. As a result of this search, over 1500 pounds of marijuana was seized and Mr. Queen was arrested. Ms. Summey had also informed Det. Hawley that Black and Queen had recently flown to Texas with several thousand dollars to pay for drug transactions. In the search of Queen's residence, two American Airlines tickets to Texas in the names of David Queen and Dale Black dated March 18, 1989 were also seized. Ms. Summey further informed Det. Hawley that David Queen was in partnership, both in the trafficking of marijuana and a used car business, with Dale Woodrow Black of Can Do Court, Gastonia. Finally, Ms. Summey stated that records for the drug transactions were kept "at either or both Black's residence or American Auto Sales."

Defendant Black first attacks the affidavit on the grounds that Ms. Summey gave Sgt. Lytton the wrong street address of 4709 Can Do Court, that Officer Ivey drove up and down the street to locate the correct

number, and that this information did not come before the magistrate. This contention is wholly without merit. In the first place, Det. Hawley, the officer who submitted the affidavit, testified that he re-interviewed Ms. Summey after she had spoken with Sgt. Lytton. During this later interview, Ms. Summey informed Det. Hawley that she believed that the street number of Black's house on Can Do Court was 4721. Additionally, Ms. Summey described Black's house as being the fourth or fifth house on the right side of the street with a double car garage to the rear and a concrete driveway. After receiving this information, Det. Hawley sent Sgt. Ivey to Can Do Court to confirm the location of the house described by Ms. Summey. Sgt. Ivey testified that he did locate the house described by Ms. Summey and radioed this information in to the police station. Consequently, based on the information provided by Ms. Summey to Det. Hawley, and the confirmation of that information by Sgt. Ivey, it is clear that the officers had probable cause to believe that the house located at 4721 Can Do Court did in fact belong to Defendant Black.

In his next argument, Defendant Black points out that "a valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time," *citing United States v. McCall,* 740 F.2d 1331, 1335–36 (4th Cir.1984), *quoting Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932), and that Ms. Summey never informed the police officers how recently she had heard the conversations between Black and Queen with regard to Black's keeping drug records at his home. If Ms. Summey's statements regarding Black's keeping drug records at his house were the only information contained in this search warrant affidavit, Defendant Black's objection might have merit. However, the search warrant application also recites that Black and Queen were partners in the trafficking of marijuana and that a search warrant executed earlier that same day had resulted in the seizure of over 1500 pounds of marijuana from Queen's residence. This additional information, together with a reasonable inference that drug records existed in relation to the 1500 pounds of marijuana seized that day, provided sufficient probable cause to believe that the drug records were in fact located at Black's residence at that time. Accordingly, this objection is also without merit.

Defendant Black next asserts that Ms. Summey's statement that "records for the drug transactions were kept at either or both Black's residence or American Auto Sales" does not serve to establish a sufficient nexus between criminal activities and Black's home. Defendant Black further argues that Ms. Summey's statement was pure speculation in light of the fact that there was no evidence that she had ever been inside Black's house. This objection ignores the fact that Ms. Summey had specifically informed the police that Queen and Black had discussed the existence of drug records and that such records existed either at Black's home or the car dealership. Black's argument would also prevent the officers and the magistrate from making the reasonable inference that Black, a man identified as a partner in Queen's drug dealing operation, could reasonably be expected to keep records of drug transactions at his home. On a similar point, the Ninth Circuit held in *United States v. Johnson,* 641 F.2d 652, 659 (9th Cir.1980),

> There is nothing in the affidavit to indicate that any other person had actually observed contraband at the house. Such a direct observation is unnecessary, however. It is only necessary that the affidavit enable the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit. The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would likely hide contraband. Drug dealers frequently hide contraband at their residences. 641 F.2d at 659 (citations omitted).

Further, to the extent that Defendant Black objects to Ms. Summey's statement that the drug records would be located "at

either or both Black's residence or American Auto Sales" as being fatally nonspecific, such argument is also without merit. As the Ninth Circuit observed in *United States v. Hillyard*, 677 F.2d 1336, 1339 (9th Cir.1982),

> When property to be seized is being moved from place to place, it may be reasonable to issue warrants directed to multiple locations, and officers need not confine themselves to chance by choosing only one location for a search. Here, it was proper for the magistrate to direct a search of both of the locations identified in the affidavit because it was reasonable that the equipment would be found *at either or both of the premises*. 677 F.2d at 1339 (emphasis added).

*Accord*, LaFave, *Search and Seizure*, Vol. I, § 3.2(e), pp. 598–99, and cases cited therein, ("other decisions on similar facts likewise hold that probable cause exists to search one or several locations connected with the defendant simply because it is more probable than not that the evidence sought is in one of those locations.") In light of Ms. Summey's proven reliability in directing the police to the marijuana bales at Queen's residence and her statement that Black and Queen had discussed the existence of drug records that were kept at either or both Black's home and place of business, together with a reasonable inference that Black would keep drug records with regard to the recently seized 1500 pounds of marijuana in one of the two places under his control, and giving due deference to the decision of the issuing magistrate, the undersigned finds that there was a substantial basis for the magistrate's finding of probable cause. *Massachusetts v. Upton*, 466 U.S. at 732–33, 104 S.Ct. at 2087–88. Accordingly, Defendant Black's motion to suppress the evidence seized from his home at 4721 Can Do Court on the grounds that the search warrant was not supported by probable cause is without merit and should be denied.

(2) *The Good Faith Exception*:

As discussed above, the Supreme Court held in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)

that where police officers have acted in reasonable reliance on a search warrant which is later proven to have lacked probable cause, the evidence seized in such a search may nonetheless be admitted into evidence. Considering all the facts known to Det. Hawley at the time he prepared his affidavit, the undersigned finds that Det. Hawley and his fellow officers acted in good faith in relying on the warrant to search Black's residence. Further, as Det. Hawley testified, in addition to the information contained in the affidavit, the officers were also aware from their interviews with Ms. Summey that she had seen "stacks and stacks of money" related to the drug transactions at Queen's residence and that Black and Queen had discussed in her presence the need to keep all of the marijuana at Queen's house and all of the cash proceeds at Black's house. During the search of Queen's residence, the officers did not find any large sums of money. Had Det. Hawley included this additional information in the search warrant affidavit, he would have established a specific nexus between Black's drug dealing and the location of cash drug proceeds at Black's residence to support probable cause for a search warrant.

Det. Hawley's inadvertence in not including this additional information in his affidavit in no way lessened his reasonable good faith belief that evidence of Black and Queen's drug dealing would be located at Black's residence. Indeed, as Det. Hawley testified, because of the late hour and the press for time, he was required to type the affidavit himself. As the Supreme Court observed in *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 2330–31, 76 L.Ed.2d 527 (1983),

> we also have recognized that affidavits "are normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area."

＊　　＊　　＊　　＊　　＊

Likewise, search and arrest warrants long have been issued by persons who

are neither lawyers nor judges and who certainly do not remain abreast of each judicial refinement of the nature of "probable cause." 462 U.S. at 236, 103 S.Ct. at 2331.

In *United States v. Leon, supra,* the Supreme Court concluded that "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." 468 U.S. at 926, 104 S.Ct. at 3422. There was no evidence that anything contained in Det. Hawley's affidavit for the search warrant of Black's home was dishonest or reckless. Nor can it be said that with all the information known to him, Det. Hawley "could not have harbored an objectively reasonable belief in the existence of probable cause." Accordingly, even if it were determined that there was insufficient probable cause for the issuance of a search warrant for Black's residence, the officers nonetheless relied in good faith on that warrant in conducting the search.

Finally, to the extent that Black challenges the availability of a good faith exception under North Carolina law, that argument is likewise without merit for the same reasons discussed *supra* with regard to Defendant Queen's argument on this point.

### (3) *Illegal Prior Entry:*

In his final argument, Defendant Black asserts that Sgt. Ivey illegally seized his house and that this conduct should result in suppression of the evidence seized in the later search of the house pursuant to the search warrant. This argument is patently without merit. In the first place, the evidence is undisputed that Sgt. Ivey conducted no search and seized no evidence until after the search warrant arrived. Prior to the arrival of the search warrant, Sgt. Ivey merely secured the premises by going inside and sitting with Mrs. Black until the search warrant arrived. Moreover, the Supreme Court has held in *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) that an illegal entry of a private residence does not require suppression of evidence seized later from that residence pursuant to a valid search warrant. Accordingly, this challenge to the admissibility of the evidence seized from Black's residence is without merit and should be denied.

### C. The Search of Black's Safety Deposit Box

Defendant Black challenges the search of his safety deposit box at Branch Banking and Trust on the grounds that (1) the search warrant application failed to establish that the information contained therein was timely or that there was probable cause to believe that drug proceeds would be located in the safety deposit box at that time, and (2) that because the search warrant authorized the search and seizure of "other items related to this investigation", the search warrant authorized "a general exploratory rummaging" that renders the warrant unconstitutional and invalid.

### (1) *Probable Cause and Good Faith:*

Although Det. Farley's affidavit in support of the search warrant for Black's safety deposit box was not artfully worded, it nonetheless informed the magistrate that a confidential and reliable informant had previously provided accurate information to the police which had led to both arrests and seizure of controlled substances. This confidential informant further advised the police that through conversations with Dale Black and David Queen the informant was aware that cash proceeds from the sale of marijuana was located in a safety deposit box at the Branch Banking and Trust Company on Garrison Boulevard. In addition to the information provided by the confidential informant, Sgt. Farley advised the magistrate in his affidavit that he was familiar with the modus operandi of narcotics suppliers and knew that the concealment of money within safety deposit boxes is a common practice. Sgt. Farley further represented that he had spoken to bank officials who confirmed the existence of the safety deposit box and the person to whom it was listed.

Inexplicably, Sgt. Farley failed to include in the affidavit additional information of which he was aware, including the fact that Black and Queen were identified by an eyewitness as having been involved in the distribution of marijuana, the fact that, just two days earlier, a search of Queen's house pursuant to a warrant had resulted in the seizure of 1500 pounds of marijuana, or the fact that a search of Black's residence pursuant to a search warrant had resulted in the seizure of nearly $200,000.00 in cash hidden throughout the house. It is also unclear why Sgt. Farley chose to refer to Ms. Summey as a confidential informant when she had been identified by name in the previous two search warrant applications.

Without deciding whether the warrant was issued on a showing of probable cause, *see e.g., United States v. Edwards,* 798 F.2d 686, 689 (4th Cir.1986), the undersigned finds that the evidence seized is admissible under the good faith exception established in *United States v. Leon, supra.* As noted above, in the discussion of the searches of Queen's and Black's residences, the suppression of evidence obtained pursuant to the execution of a search warrant "is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." 468 U.S. at 926, 104 S.Ct. at 3422. There is no evidence that any of the information contained in Sgt. Farley's affidavit was either dishonest or reckless. Additionally, although Sgt. Farley could have included additional information in the affidavit of which he was aware, his failure to do so does not lessen his good faith reliance on the warrant. As noted above, "technical requirements of elaborate specificity" has no proper place in the reviewing of search warrants, particularly where those warrants are prepared by persons who are neither lawyers nor judges. *Illinois v. Gates, supra,* 462 U.S. at 236, 103 S.Ct. at 2331. Sgt. Farley was aware that prior information provided by Ms. Summey had proven true and accurate in the searches of Queen's and Black's residences. Possessed

of this information, it is completely reasonable for Sgt. Farley to have relied on further information provided by Ms. Summey—that she knew from conversations with Queen and Black that Black kept cash proceeds from his drug deals in a safety deposit box—to apply for and execute a search warrant for Black's safety deposit box. Under all of these facts, the undersigned finds that at the time he applied for the search warrant, Sgt. Farley could have "harbored an objectively reasonable belief in the existence of probable cause." Accordingly, regardless of whether probable cause was established by the information contained in Sgt. Farley's affidavit, the search of Black's safety deposit box was nonetheless valid under the good faith exception recognized in *United States v. Leon* and any evidence seized pursuant to the execution of that search warrant may be admitted at trial.

(2) *Excessive Scope of the Search Warrant*:

In his final claim, Defendant Black challenges the search warrant issued for his safety deposit box on the ground that the description of the property to be seized included the phrase "other items related to this investigation." Defendant Black argues that the inclusion of this phrase converts the warrant into a general warrant which authorized an unconstitutional exploratory search by the officers. This argument is without merit. In *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the defendant argued that a search warrant was rendered fatally "general" by the addition to the exhaustive list of particularly described documents of the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." 427 U.S. at 479, 96 S.Ct. at 2748. In rejecting this challenge, the Supreme Court held that the additional language merely relates back to refer to evidence of the specific crime under investigation and that the search warrant was properly limited to search for and seize evidence relative to the specific crime of false pretenses and a particular land trans-

action. The language contained in the present warrant is no more general than that contained in *Andresen v. Maryland.* The additional language "other items related to this investigation", when considered in light of all the other information contained in the warrant, sufficiently circumscribes the searching officer's discretion to search for and seize only items relevant to the specific crime of drug trafficking. Accordingly, this challenge to the search warrant is without merit and should be denied.

### III. RECOMMENDATION

On the basis of the foregoing, the undersigned Magistrate respectfully recommends that the Defendant's motions to suppress evidence seized during the search of American Auto Sales, Gastonia, North Carolina, and a 1978 Chevrolet Z–28 Camaro located on the premises of American Auto Sales, be dismissed as moot, and that the Defendants' motions to suppress evidence seized pursuant to state search warrants from 1816 E. Garrison Boulevard, Gastonia, North Carolina (Queen's residence), 4721 Can Do Court, Gastonia, North Carolina (Black's residence), and safety deposit box #359 at Branch Banking and Trust Company on Garrison Boulevard, Gastonia, North Carolina (Black's safety deposit box) be denied.

### NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Failure to file objections to this Memorandum with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).